UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
DAVID DWAYNE BENEFIELD and
CYNTHIA SUE BENEFIELD,
     Debtors.                  No. 11-10-11077 SA

**MEMORANDUM OPINION IN SUPPORT OF ORDER
DENYING EMERGENCY MOTION TO DECLARE
AUTOMATIC STAY IN EFFECT
<u>PURSUANT TO SECTION 362(c)(4)</u>**

Before the Court were three motions and the objections

thereto: the Motion for Determination that Stay is Not in Effect

Pursuant to 11 U.S.C. § 362(c)(4) filed by Creditors Danny and

Shirley Slaysman (doc 7) and the response thereto (doc 24) by

Debtors Cynthia Sue Benefield and David Dwayne Benefield,

Debtors' Emergency Motion to Declare the Automatic Stay in Effect

or in the Alternative to Reinstate Automatic Stay Pursuant to

Section 362(c)(4) (doc 8), and Creditors' Motion for Order

Retroactively Annuling [sic] Automatic Stay (doc 11) and Debtors'

response thereto (doc 26).  On August 20, 2010 the Court issued a

memorandum opinion and order granting Creditors' Motion for

Determination that the Stay is Not in Effect (doc 7) and denying

Creditors' Motion for Stay Relief (doc 11) as moot.[1]  Docs 66

---

[1] As noted in the companion memorandum opinion, Debtors filed
their voluntary chapter 11 petition on March 5, 2010 (doc 1), the
first two motions were filed on March 10, and the stay relief
motion on March 11.  The Court conducted the final hearing on the
motions on April 22 and June 18, 2010 (combined minutes – doc
(continued...)

(memorandum opinion), 67 (order declaring stay not in effect) and 68 (order denying motion for stay relief as moot). This memorandum opinion is issued in support of an order denying Debtors' Emergency Motion to Declare the Stay in Effect or to Reinstate the Stay (doc 8).[2] These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) and (G)[3].

**Background**

On December 31, 2008 Debtors filed a chapter 12 bankruptcy petition in order to prevent the foreclosure of their cattle

---

[1](...continued)
54). Debtors filed their motion to impose the stay timely; _i.e._, within thirty days of the filing of the petition. § 362(c)(4)(B). That section does not impose a time limit for the court to conduct a hearing on the motion. In contrast, § 362(c)(3)(B), applicable when only a single case has been pending in the previous year, requires the hearing to take place within the thirty days following the filing of the petition. The reason for a debtor not having to obtain a ruling on the motion within thirty days under § 362(c)(4) is obvious: there is no automatic stay that ends in thirty days. However, that lack of limitation is really a disadvantage, since time is a debtor's enemy in a race with a creditor to impose a stay; the longer it takes the debtor to get to the courthouse for relief (much less get the relief itself), the more advantage the creditor can take.

[2] The Court incorporates by reference the analysis and more detailed background from the companion memorandum opinion. Doc 66.

[3] 28 U.S.C. § 157(b)(2)(G) "includes" as core proceedings "motions to terminate, annul, or modify the automatic stay;..." Strictly speaking, a motion to impose the stay is none of the above, but the term "includes", and a dollop of common sense, provides sufficient reason to conclude that this proceeding is core.

operation.  <u>In re David and Cynthia Benefield</u>, No. 12-08-14483.
That case was dismissed on October 14, 2009 for Debtors' failure
to timely file a plan of reorganization.  Doc 87.  In the oral
findings of fact and conclusions of law upon which the ruling was
predicated, this Court specifically found that Debtors had not
acted in bad faith.  Debtors filed another chapter 12 case on
November 12, 2009.  <u>In re David and Cynthia Benefield</u>, No. 12-09-
15173.  Creditors quickly filed Slaysmans' Emergency Motion to
Dismiss Debtors' Chapter 12 Bankruptcy Pursuant to 11 U.S.C. §
109 (doc 10), which came on for a final hearing on February 4,
2010, was continued on February 10, and concluded on February 11.
The Court again recited findings of fact and conclusions of law
orally on the record and entered an order dismissing the chapter
12 case on February 12, 2010.  The instant case promptly ensued
three weeks later.[4]  The Court conducted a trial on the merits of
the various motions on April 22 and June 18, 2010 (doc 54 –
combined minutes).

**Discussion**

    The remaining issue in this case is whether the automatic
stay in this case, Debtors' third, should be imposed despite the

---

[4] Debtors have not filed a plan and disclosure statement; they
did however timely file a motion to extend the exclusive period
within which they may file the plan and disclosure statement (doc
55), to which Creditors objected.  Doc 58.

Case 10-11077-s7    Doc 73    Filed 09/14/10    Entered 09/14/10 14:02:34 Page 3 of 36

dismissal of two previous cases within the preceding year.  The

relevant portion of the applicable statute – § 362(c) – is as

follows:

> (4)(A)(i)  if a single or joint case is filed by or
> against a debtor who is an individual under this title,
> and if 2 or more single or joint cases of the debtor
> were pending within the previous year but were
> dismissed, other than a case refiled under section
> 707(b),[5] the stay under subsection (a) shall not go
> into effect upon the filing of the later case; and
>      (ii) ...;
>    (B) if, within 30 days after the filing of the later
> case, a party in interest requests the court may order
> the stay to take effect in the case as to any or all
> creditors (subject to such conditions or limitations as
> the court may impose), after notice and a hearing, only
> if the party in interest demonstrates that the filing
> of the later case is in good faith as to the creditors
> to be stayed;
>    (C) a stay imposed under subparagraph (B) shall be
> effective on the date of the entry of the order
> allowing the stay to go into effect; and
>    (D) for purposes of subparagraph (B), a case is
> presumptively filed not in good faith (but such
> presumption may be rebutted by clear and convincing
> evidence to the contrary)--
>      (i) as to all creditors if--
>          (I) 2 or more previous cases under this title
>          in which the individual was a debtor were
>          pending within the 1-year period;
>          (II) a previous case under this title in
>          which the individual was a debtor was
>          dismissed within the time period stated in
>          this paragraph after the debtor failed to
>          file or amend the petition or other documents
>          as required by this title or the court
>          without substantial excuse (but mere

---

[5] Sic.  Cases are not "filed" under § 707(b).  Congress
presumably intended to state "other than a case refiled <u>after
dismissal</u> under section 707(b)...," wording which would parallel
the analogous provision of § 362(c)(3).

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 4 of 36

> inadvertence or negligence shall not be
> substantial excuse unless the dismissal was
> caused by the negligence of the debtor's
> attorney)...; or
> (III) there has not been a substantial change
> in the financial or personal affairs of the
> debtor since the dismissal of the next most
> previous case under this title, or any other
> reason to conclude that the later case will
> not[6] be concluded, if a case under chapter 7,
> with a discharge, and if a case under chapter
> 11 or 13, with a confirmed plan that will be
> fully performed; or
> (ii) as to any creditor that commenced an action
> under subsection (d) in a previous case in which
> the individual was a debtor if, as of the date of
> dismissal of such case, such action was still
> pending or had been resolved by terminating,
> conditioning, or limiting the stay as to such
> action of such creditor.

Section 362(c)(4).

The remaining issue before the Court is whether Debtors filed the current case in "good faith", as that term is used in this particular statute, thereby allowing them to now obtain the benefit of the stay. Summarizing the relevant portion of the statute in question, a court may impose the stay (but not retroactively) if a party in interest (in this case Debtors) timely makes such a request and can prove that the current case was filed in good faith. But a case is presumptively not filed in good faith -- alternatively put, is presumed to have been

---

[6] Sic. The extra "not" appears to produce a result precisely the opposite of what Congress intended.

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 5 of 36

filed in bad faith[7] -- and thus the automatic stay may not be imposed where (as applicable to the facts of this case) (1) two or more prior cases were pending within one year, (2) debtors failed to file required documents without substantial excuse in a previous case, which failure to file led to a dismissal, or (3) there has not been a substantial change in the debtors' financial or personal affairs since the dismissal of the next most previous case, nor is there any other reason to think that the latest filed case will result in the confirmation and full performance of a chapter 11 plan. If a presumption of bad faith arises, the party in interest may rebut the presumption, but it may do so only by clear and convincing evidence to the contrary. Finally, as to any specific creditor, there is a presumption of bad faith in filing the current case if the creditor in question had filed a motion for stay relief "in a previous case" and that motion was either pending when the previous case was dismissed or had been resolved by terminating, conditioning or limiting the stay

---

[7] Rather than using the term "bad faith", portions of the statute use the phrase "not in good faith", e.g., §362(c)(4)(D), in precise contrast to those parts of the statute which require a demonstration of "good faith". E.g., §362(c)(4)(B). In this memorandum opinion the Court will sometimes use "bad faith" to mean "not in good faith". See Williams, 2 Bankruptcy Practice Handbook § 9.3 (2nd ed. June 2010).

(emphasis added).  Any rebuttal of that presumption must also be

by clear and convincing evidence.[8]

Even though only one of the circumstances explicated in §

362(c)(4)(D)(i) needs to exist for the presumption of bad faith

to arise as to all creditors, In re Hurt, 369 B.R. 274, 278 n. 7

(Bankr. W.D. Va. 2007), all three circumstances exist in this

case.  Similarly, as to Creditors specifically, Creditors sought

stay relief in the first case (12-08-14483), which request was

not simply denied.  Therefore, the presumption of bad faith

arises as to them specifically.  Debtors have not established by

clear and convincing evidence that the present case was filed in

---

[8]     If met, the clear-and-convincing evidentiary standard
        [places] in the ultimate factfinder an abiding
        conviction that the truth of [the party's] factual
        contentions are "highly probable." See C. McCormick,
        Law of Evidence § 320, p. 679 (1954). This would be
        true, of course, only if the material [the party]
        offered instantly tilted the evidentiary scales in the
        affirmative when weighed against the evidence [the
        other party] offered in opposition. See generally
        McBaine, Burden of Proof: Degrees of Belief, 32
        Calif.L.Rev. 242, 251254 (1944).
Colorado v. New Mexico, 467 U.S. 310, 316 (1984).  Compare Shafer
v. Army & Air Force Exch. Serv., 376 F.3d 386, 396 (5th Cir.
2004) which defined "clear and convincing evidence" as
        that weight of proof which produces in the mind of the
        trier of fact a firm belief or conviction as to the
        truth of the allegations sought to be established,
        evidence so clear, direct and weighty and convincing as
        to enable the fact finder to come to a clear
        conviction, without hesitancy, of the truth of the
        precise facts of the case.
See also Black's Law Dictionary 577 (7th ed. 1999) ("highly
probable or reasonably certain").

"good faith" as that term is operationally defined for this part of the Code.

Courts disagree about how a debtor proves good faith.  For example, <u>In re Whitaker</u>, 341 B.R. 336, 345-46 (Bankr. S.D. Ga. 2006), looked only to what led the debtors in that case to be invoking § 362(c)(3)[9], whether there had been a substantial change in the debtor's personal or financial circumstances since the last case and whether the current case was likely to result in a successful chapter 13 plan.  <u>Id.</u>, at 345-46.  That is, the <u>Whitaker</u> approach looks only at the circumstances specified in the statute to see if the presumption has been rebutted, and does not require an overall good faith examination under a "totality of the circumstances" test.[10]  On the other hand, <u>In re Ferguson</u>, 376 B.R. 109 reasoned that the "totality of circumstances" test had been used for so long that Congress must have been aware of its long usage and intended the courts to use it in connection with this portion of the Code.  <u>Id.</u>, at 120, citing <u>In re</u>

---

[9] Courts have ruled that because of the similarities between § 362(c)(3) and § 362(c)(4), cases construing one provision are helpful in construing the other [assuming the provisions being compared are similar].  <u>Ferguson</u>, 376 B.R. 109, 119 n. 19 (Bankr. E.D. Pa. 2007) (citing <u>Hurt</u>, 369 B.R. at 278-79).

[10] The <u>Whitaker</u> court, unable to fit the debtors' situation into either § 362(c)(3) (debtors' counsel filed the motion too late) or § 362(c)(4) (debtors had only one prior case), fell back on § 105 to impose a stay.  341 B.R. at 346-48.  The Court is not citing <u>Whitaker</u> for that ruling.

<u>Montoya</u>, 333 B.R. 449, 457-58 (Bankr. D. Utah 2005). Other courts combine the two, by establishing a dual "objectively futile and subjective bad faith" test. <u>E.g.</u>, <u>Hurt</u>, at 279-281 (stay imposed when debtor had confirmed a chapter 13 plan in his third case). <u>See also</u> <u>In re Jenkins</u>, 2010 WL 1558678 (Bankr. N.D. Tex.) at *2-3 (summarizing four approaches: totality of circumstances, factor-driven or checklist, updated good faith test employing standards found in §§ 362(c)(3) and (4), and a test combining the first three approaches); <u>In re Carr</u>, 344 B.R. 776, 781-82 (Bankr. N.D. W. Va. 2006) (in ruling on uncontested § 362(c)(3) motion to continue the stay in a chapter 13 case, court assessed good faith using six-part test that necessarily differed from the good faith test for confirming a chapter 13 plan); <u>In re Galanis</u>, 334 B.R. 685, 691-93 (Bankr. D. Utah 2005) (revised totality of circumstances test for determining good faith in filing a chapter 13 case, relying in part on <u>Gier v. Farmer's Bank of Lucas (In re Gier)</u>, 986 F.2d 1326 (10th Cir. 1993)); <u>In re Sarafoglou</u>, 345 B.R. 19, 24-25 (Bankr. D. Mass. 2006) (streamlined four-part test).

What seems clear from the statute is that Congress expected a debtor to address directly any of the applicable circumstances arising from § 362(c)(4)(D) which apply to the debtor. And by "address", the Court means that a debtor, by clear and convincing

evidence, must "explain away" or justify the debtor's role in those circumstances, and further explain why the Court should be confident that the current case will be successful when the previous cases were not. This is what some courts usefully term the "objective futility" test. E.g., Hurt, at 279 (citing Carolin Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1989) (analysis of good faith in the context of a motion to dismiss a chapter 11 case)). To do no more than apply the usual totality of circumstances test would seem to effectively ignore the addition of §§ 362(c)(3) and (4) to the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Thus at a minimum a court should first apply the "objective futility" test. If the debtor cannot pass that test, there is no need to move on to the totality of circumstances test, even if that second test is required. See In re Collins, 335 B.R. 646, 653 (Bankr. S.D. Tex. 2005) (in a § 362(c)(3) case, debtor failed to prove that new case would likely end in a discharge, so that court did not do a totality of circumstances examination. "Failure to meet the objective good faith requirement ends the analysis. Subjective good faith is consequently irrelevant." (Citation omitted.)).

Debtors first argue that the Court, in dismissing the previous case (No. 12-09-15173), ruled that Debtors had acted in

Case 10-11077-s7    Doc 73    Filed 09/14/10    Entered 09/14/10 14:02:34 Page 10 of 36

good faith in filing the second case and that that finding has collateral estoppel effect such that the Court cannot dismiss this case for bad faith. Debtors' Brief at 7-12 (doc 28). Debtors' construct the argument's starting point – the finding of good faith – in part by noting, correctly, that the Court did not make a finding in the second case that Debtors acted in bad faith, despite being so requested by Creditors, and in part by noting the Court's statements that Debtors always told the truth as best they saw it. Debtors' exhibit 40 (Transcript of February 11, 2010 hearing) p. 14, ll. 12-17 and p. 23 ll. 2-6. From there they argue that just as a finding of bad faith in the second case would "follow them" into the third case, so also must a finding of good faith.

The argument, while superficially attractive, does not work. To begin with, and to clarify, in making findings of fact and conclusions of law in the course of dismissing Debtors' second case on February 11, 2010, the Court commented that the Debtors had always told the truth as they perceived it and that nothing the Court had decided was intended to suggest otherwise. Further, the Court was merely saying that Debtors' intent in filing the second case, as it was in filing the first case, was a desperate effort to hold on to the cattle operation, and Debtors were not filing the cases "to cause hardship or delay to

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 11 of 36

creditors by resort to the chapter [12] device merely for the purpose of invoking the automatic stay, without intent or ability to reorganize [their] financial activities".    Hurt, 369 B.R. at 280 (citation and internal quotation marks omitted).  That language was not intended to adjudicate Debtors' compliance with the specific requirements of any part of § 362, including § 362(c)(3), nor to address a possible subsequent filing by Debtors, even though practically speaking it might reasonably be construed as a finding of Debtors' good faith as that term is generally understood without reference to the operational definitions contained in §§ 362(c)(3) and (4).

That said, the mere fact that Debtors were acting in good faith in pursuing their second case cannot mean that they must have been acting in good faith in filing the third case.  The doctrine of collateral estoppel addresses matters that were or could have been litigated in the previous litigation; no one could have litigated the Debtors' good faith in connection with a case not yet filed.  That is, it is the act of filing the third case itself that brings on the good faith/bad faith scrutiny, albeit that scrutiny consists in part at least of looking to the debtor's past behavior under §§ 362(c)(3) and (4).[11]

---

[11] Not that counsel should be criticized for making the argument. In all, counsel did a creditable job in representing Debtors who

(continued...)

## A.   <u>TWO OR MORE PRIOR CASES PENDING WITHIN ONE YEAR</u>

The record is clear that Debtors had two cases pending,[12] indeed dismissed, within one year of the filing of the current bankruptcy case on March 5, 2010. The first case was dismissed on October 14, 2009, and the second on February 12, 2010.  Debtors' explanation for the two dismissed cases focused largely on blaming both of their former bankruptcy counsel for the dismissal of the first case.  But the Court finds from the testimony of their second attorney Chris Pierce who did the bulk of the work, that he labored continually and successfully, until the very end, to make the chapter 12 work for Debtors.  He did this in the face of not just determined opposition from a well represented foe, but also with a frequent lack of basic support from his clients. His testimony about the continual air of crisis which stemmed from Debtors' apparent inability to understand the significance of various tasks with deadlines and to then timely complete the tasks – whether providing documents, making payments, reviewing

---

[11](...continued)
have found themselves in a position very difficult to defend.

[12] By definition this circumstance will arise in every § 362(c)(4) case.  Presumably this circumstance is listed in order to require every debtor in this sort of case to justify how he or she got to this stage.

pleadings or approving a plan[13] – was compelling.  Obviously Mr.
Pierce was not saying that Debtors acted the way they did
deliberately or in bad faith in order to sabotage their case;
rather this was and is simply the way they are.  Somehow there
was always something to be done or something that had happened
that made accomplishing tasks and meeting deadlines difficult:
bad weather, lack of communications technology, horses to be
watered and fed, neighbors' cattle to be tended,
misunderstandings about requirements, bounced checks, etc.
Successfully completing a chapter 12 or chapter 11 case requires
a certain level of competence and commitment, and that was simply
lacking in the first case, and to a real extent, as explained
next, in the second case as well.  Ironically, the very reason
Debtors cannot be charged with deliberately acting in bad faith
is the reason the Court cannot find that they will be successful
in confirming and completing a plan: they seem to sabotage
themselves at every turn, albeit unintentionally.

        In consequence the Court cannot find by clear and convincing
evidence that Debtors should not be held responsible for the
dismissal of the two previous cases.

**B.    <u>FAILURE TO FILE DOCUMENTS IN A PRIOR CASE</u>**

---

[13] For example, Mr. Pierce testified that it took Debtors from
April until August just to approve a plan for filing.

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 14 of 36

When Debtors' second case was dismissed, the Court cited on the record in its oral findings of fact and conclusions of law Debtors' failure to obtain the prepetition budget and credit counseling required by § 109(h) within the 180-day period preceding the filing of the petition, failure to file a chapter 12 plan timely (§ 1221), and ineligibility for Chapter 12 (§§ 101(18) and 109(f)) as "family farmers".[14] The failure to file the chapter 12 plan within the ninety-day deadline required by § 1221 constitutes a failure to "file . . . [a document] as required by this title...." § 362(c)(4)(D)(i)(II). Obviously this omission was an oversight arising out of inadvertence, ignorance of the statute or, at worst, negligence. Debtors did not offer a specific explanation or defense of this omission. And because Debtors were self-represented throughout the second case, they cannot rely on the defense that counsel was responsible for the omission. Thus the Court has no basis to treat the failure to file a plan timely as other than "bad faith" as operationally defined in the statute.

**C.** **NO SUBSTANTIAL CHANGE IN FINANCIAL OR PERSONAL AFFAIRS OF DEBTORS NOR ANY OTHER REASON TO CONCLUDE THAT THIS CHAPTER 11 CASE WILL BE CONCLUDED WITH A CONFIRMED PLAN THAT WILL BE FULLY PERFORMED**

---

[14] Benefield exhibit 40.

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 15 of 36

Debtors argued that there were several changes in their financial affairs[15] that overcame the presumption of the bad faith filing: Cynthia Benefield's salary increase, David Benefield's increased income, and the expectation of a better calf crop this year. The statute requires that the changes be "substantial" and that they have taken place "since the dismissal of the next most previous case...." Thus the changes must have taken place after February 12, 2010.[16] The Court also considers the likelihood of Debtors' successfully confirming and performing under a plan.

**1. Salary increase of Cynthia Benefield in December 2009:**

Ms. Benefield, an employee of the Albuquerque Public Schools ("APS"), testified that she received a promotion in October, with the first payment received in December 2010, and that she is currently earning approximately $62,000 per year as an assistant principal and special education coordinator.[17] The raise took

---

[15] No evidence was offered about any change in Debtors' personal affairs as opposed to their financial affairs.

[16] Given the facts of this case, the Court need not decide whether the changes must have taken place within the three-week period between February 12 and March 5, or whether changes after the March 5 petition date in the current case can also be taken into account.

[17] There is some question whether this testimony is consistent with Schedule I (filed March 19, 2010 – doc 23) which reports a monthly gross income for Ms. Benefield of $9,526.27 and net
(continued...)

place before the next most previous case was dismissed on February 12, 2010. It therefore cannot be considered as a substantial change in circumstances since the dismissal of the next most previous case.

**2. David Benefield's income:**

Mr. Benefield testified that he earns $800 per month from the Chavez Ranch. That is consistent with the income, including the $1,116.67 that he earns from the cattle operation, reported on Schedule I (doc 23). Schedule I in Debtors' first case is identical.[18] At the April 22, 2010 hearing, Mr. Benefield testified that he hoped to earn an extra $500 per month with the addition of cattle to the Chavez Ranch; no evidence has been submitted that that has happened.

Also at the April hearing Mr. Benefield testified that he was qualified to sell solar panels, that he was in the process of obtaining certification to install solar panels, and that he was pursuing those opportunities. He testified he had not made any money as of the April hearing from solar panel sales or

---

[17](...continued)
income of $7,473.66. Twelve months of gross income would total $114,315.24; nine months of net income would total $67,062.94. The discrepancy, if any, would benefit Debtors by suggesting a basis for thinking they could confirm and successfully complete a plan, if the increase had taken place in the correct time frame.

[18] 08-14483, Doc 14. Debtors did not file schedules in their second case.

installations, although a sale would be worth approximately
$20,000.  He projected $60,000 per year income from three sales
per year.  Mr. Benefield contended that he had yet to close a
sale because it takes approximately one year to close a sale and
this case has interfered with his sales and installation
opportunities.  Ms. Benefield testified at the June hearing that
Mr. Benefield had by then received his installation
certification.

   The Court is not convinced that the ability and
opportunity to sell and instal solar panels will result in any
significant amount of income any time soon, especially if,
ironically but not surprisingly, the burden of being a debtor in
possession is one of the things preventing Mr. Benefield from
benefitting from this development.  Thus his solar panel training
and qualification cannot be considered as a qualifying change in
circumstances.

### 3. The 2010 calf crop

   Finally, Mr. Benefield testified that he expects a healthy
calf crop for this year unlike the prior calf crop which suffered
from tainted semen.  He anticipates this will yield additional
but unspecified income.  This evidence is too speculative to
rebut the presumption of bad faith.

### 4. Any other reason to assume Debtors will confirm a plan

The statute also allows Debtors to prove that there is "any other reason to conclude that [this chapter 11 case will] be concluded . . . with a confirmed plan that will be fully performed." Unfortunately for Debtors, for whatever reason and whether it is their fault or not, the evidence from all the New Mexico litigation is that Debtors are almost invariably unable to meet deadlines or other objectives in order to protect their interests and successfully consummate their bankruptcy cases.

The prelude to the New Mexico bankruptcy cases was Debtors' inability to meet the payment schedule of the purchase agreement, even when it was extended.[19] In the contract, Debtors agreed to monthly interest-only payments at a six percent interest rate for two years with the full balance coming due at the end of the two-year period.[20] Debtors made a $100,000 down payment on the property at closing on December 22, 2006.[21] The remaining principle balance of $330,000 was due in December

---

[19] From the outset in all three cases, Debtors have wanted the chance to argue the merits of the foreclosure action and in particular their view that their problems derive almost exclusively from Creditors' failure to comply with the Purchase Agreement. By failing to respond to the foreclosure complaint, Debtors in effect gave up their right to argue those issues. However, they received at least some opportunity to present the merits of their argument in the course of litigating these motions.

[20] Benefield exhibit 38.

[21] Id.

Case 10-11077-s7    Doc 73    Filed 09/14/10    Entered 09/14/10 14:02:34 Page 19 of 36

2008.[22]  When Debtors began having difficulties making the

monthly payments, the parties agreed to the interest payments due

in October, November and December 2007 being deferred until

December 2008.[23]  Debtors blamed circumstances outside their

control for the need for the deferral, including the replacement

of equipment, winterizing the house, a delay in expanding the

Bureau of Land Management ("BLM") lease capacity, tainted semen,

etc.  The exhibits and the testimony of Mr. Slaysman and of

Debtors adequately explained why at least a good part of the

problems that Debtors experienced were of their own doing.

   For example, Debtors passed up the opportunity to have an

inspection of the house in order to save money, an inspection

which would probably have shown that the house was simply not

habitable in the winter (nor had it been intended to be).

Indeed, it appears that Creditors had done relatively little

during the winter to run the operation; Debtors on the other hand

attempted to fully run the operation year round.  As a result

winters presented a particularly difficult time for Debtors to be

---

[22] Id.

[23] Mr. Slaysman testified that Ms. Benefield told him that they
were experiencing financial hardship and he proposed deferring
the payments until the 2008 balloon payment. Ms. Benefield
testified that she proposed the modification because the
financial hardship was due to the extensive repairs to the
property.  Whichever party is correct is not material.

away from the ranch at least in part because of weather and because to run the operation they used horses which require daily care.[24]

      Similarly Debtors claimed their problems stemming from not owning the propane tank, from the well transfer that did not take place and from the lack of contact with the person who had purchased the calves from Creditors, were attributable to Creditors. It is not clear exactly what obligations Creditors owed with respect to these items. It appears that no one had seriously investigated (rather than make assumptions about) the status of the propane tank prior to the closing. The fact that neither Creditors nor the well servicing company had good records on the wells is not the fault of Creditors. Nor was it Creditors' fault that their former cattle purchaser never responded to Debtors. In any event these are the things that are supposed to be clarified before closing and transacted at closing.[25]

---

[24] Apparently Creditors used four-wheeled all terrain vehicles ("quads") to herd the cattle. Benefield exhibit 39, p. 12, ll. 17-18.

 The purchase agreement provided that five days after the execution of the purchase agreement, and long before closing, documentation concerning the water rights, the well, leases and permits was supposed to be made available by seller to purchasers. Id. at 5, ¶ 15. The blanks setting a deadline for purchasers (Debtors) to object were left blank. Thus Debtors,
(continued...)

Debtors heavily emphasized the sale by Mr. Slaysman of the 2006 elk tag[26] which Debtors insisted was part of what was advertised as being sold and which Creditors insisted was not part of the sale.  What both sides agree on is that Mr. Slaysman sold the tag (for $3,500, according to Mr. Slaysman) and talked about it to Debtors months before the closing in December. Despite that, Debtors closed anyway because, according to Ms. Benefield, they did not want to upset the closing.  Aside from the fact that the $3,500 is a fairly small amount of money in the scheme of things, it is also the case that Debtors made a deliberate choice to waive this problem.

---

(...continued)
probably through their real estate agent, could have demanded that documentation to insure they knew what they were getting, or not getting.  Apparently their real estate agent, who had trouble from the outset documenting the transaction (he used Arizona forms instead of the New Mexico forms), did not perform that function for Debtors.

[26] Persons interested in hunting various game animals apply to the New Mexico Department of Game and Fish for the chance to be awarded a license for a particular year and specific sorts of animals.  The licenses are awarded on a computer-managed modified first-come-first-serve/lottery basis to qualified applicants. Licensees receive both a license and a "carcass tag", the latter of which, as the name suggests, is to be attached to a carcass which results from a successful hunt.  Qualified landowners who sign elk agreements with the Department receive elk landowner authorizations for the upcoming season and can barter, sell or trade those authorizations.  Information for E-PLUS [Elk - Private Lands Use System] Landowners, as of July 25, 2008, at http://wildlife.state.nm.us/recreation/hunting (last visited on September 10, 2010).

Another example of Debtors' difficulties not being
attributable to Creditors stems from Debtors' insistence all
along that Creditors' failure to timely transfer to them the
Aldeghi lease[27] precluded them from grazing additional cattle on
their BLM lease.[28]

Mr. Slaysman testified that prior to the execution of the
contract, Debtors explained that 24 cattle would not be enough to
make the operation work; they needed at least 30.  By virtue of
the Aldeghi lease and the resulting increase in the animal units
per month ("AUMs") permitted on the BLM lease, the operation
could consist of 33 head.[29]  Based on the evidence the Court
believes that Mr. Slaysman acted reasonably diligently in
obtaining the documentation for the transfer of the Aldeghi lease
and the BLM increased allotment, albeit his performance was tardy
as measured by the closing date of December 22, 2006.[30]

---

[27] Slaysman exhibit 21.

[28] Slaysman exhibit 9.  In order to obtain a lease of BLM or U.S.
Forest Service land on which to graze cattle, the lessee must
have some ownership or control of an interest in "attached"
grazing land.  That interest may be a fee interest or a lease
interest.

 Addendum no. 3 to the purchase agreement, Benefield exhibit 38,
provides in part: "Count to be 31 cows, 2 bulls, and unsold bull
calves."  This addendum was executed the day of the closing,
December 22, 2006.

 It appears to the Court that Creditors had been informally
                                            (continued...)

Mr. Slaysman executed the BLM lease transfer on January 31, 2007[31], and delivered it to Debtors promptly thereafter, and the BLM grazing permit, allowing 33 CYL ("cattle yearlong") in total, was issued June 8, 2007, effective retroactively to March 1, 2007.[32]  Mr. Benefield testified that the BLM required that the Aldeghi lease be in the Debtors' names in order to have the benefit of the increased AUMs on the BLM lease, and that in fact at one point the BLM threatened Debtors with the immediate loss of nine CYL on the BLM land if Debtors did not get the Aldeghi lease in their names.[33]  Mr. Benefield testified that they never received an assignment of the lease.  However, the problem was apparently solved when Debtors moved to assume the Aldeghi lease on June 5, 2009 (No. 12-08-14483, doc 49) and the order granting that motion was entered July 2, 2009 (doc 56).  In the meantime, according to Mr. Benefield, when the BLM lease was first issued

_____

(...continued)
renting the Aldeghi land prior to August 5, 2006, when they obtained from Mr. Aldeghi somewhat more formal documentation of that arrangement, Slaysman exhibit 21, perhaps in anticipation of the sale of the operation.

[31] Slaysman exhibit 9.

[32] Id.

[33] Mr. Benefield testified that the BLM had a copy of the Aldeghi lease in its files although Debtors did not have a copy of it; what the BLM apparently required was a specific assignment of the lease to Debtors for the BLM files.

to Debtors in June 2007, the BLM committed to working with Debtors until the Aldeghi lease was put in their names.  And, critical to the decision on this issue, there was no evidence that Debtors ever in fact had their allotment reduced due to not having a formal assignment of the Aldeghi lease.

The Aldeghi lease was for approximately 500 acres of "open range" within a larger parcel of land named Antelope Run Subdivision.  It permitted grazing on any of the unsold land – the 500 acres -- but reserved lessor's right to continue to market the unsold land.[34]  The order permitting the assumption explicitly provided that nothing in the assumption order would "impair" lessor from selling any of the remaining unsold portions of the leased land (doc 56).  And in fact, when the lessor (Aldeghi through counsel) responded on June 18 to the motion to assume, it stated that since the lease had been executed in August 2006, the unsold acreage had been reduced to about 300 acres (doc 54).  The BLM permit was executed by Debtors on June 7, 2007 and approved by the BLM on June 8, 2007, with the standard (and in this case, retroactive) effective period of March 1, 2007 – February 28, 2008.  It permitted 33 cattle (CYL) at 67% active usage, for total AUMs of (33 x 12 months x .67 =)

---

[34] Serene Properties, Inc. was the actual owner of the property; Brian Aldeghi was Serene Properties' president.  Throughout these proceedings the parties have referred to the "Aldeghi lease".

265. The lease explicitly included nine CYL on the BLM land, as follows:

> ADDITIONAL 9 CYL FOR THE TERM OF 9/1/2006 TO 2/28/2016 BASED ON AGREEMENT TO GRAZE THIRD PARTY PRIVATE LAND IN ALLOTMENT. LIVESTOCK NUMBERS WIL [sic] BE REDUCED IF THIRD PARTY PRIVATE LAND DECREASES BELOW 500 ACRES. SEE AGREEMENT DATED AUGUST 5, 2006 [the Aldeghi lease].

Notwithstanding the documentation and the testimony, there was no evidence exactly what losses Debtors suffered that could be attributable to whatever delay there was in delivering the assignment of the Aldeghi lease. Mr. Slaysman testified that he obtained the additional AUMs based on the Aldeghi lease before the closing took place, and since the cattle were part of the sale to Debtors, presumably in situ, it appears that Debtors in effect had the full benefit of the Aldeghi lease as written. Mr. Pierce testified that the BLM then did reduce the number of cattle allowed to graze due to a reduction in the available grazing area in the Aldeghi lease, and he also testified that BLM was informed that other parcels of the Aldeghi lease land had become available for grazing again, but that the BLM was not taking into consideration the newly (or again) available land and that Aldeghi would not cooperate in their dispute with the BLM. None of these particular post-transfer complications were Creditors' fault, of course.

Page 26 of 36

Related to the BLM lease issue was Debtors' gamble that they could take an operation that netted between $11,000 and $18,000 per year and with the addition of a few CYL, make a living off the operation.  Mr. Slaysman testified that he told Debtors that he and Ms. Slaysman held down full-time jobs that supported them while they managed the operation.  Debtors did not contest this evidence.

The profit and loss statements for the Slaysman cattle operation provide some support for Creditors' testimony.  Debtors did not successfully challenge that evidence.  Mr. Slaysman testified that he provided Debtors the profit and loss statements (the last four pages of Benefield exhibit 38) to help make it clear to Debtors just how little profit they could expect from the operation if they were going to purchase it (a level of apparently voluntary disclosure from a seller so considerable that it raises some question of credibility).  Those statements were for calendar years 2003 (net gain $11,067), 2004 ($12,794), 2005 ($18,041) and (projected) 2006 ($16,496 or $15,496).[35]

---

[35] The 2006 P&L is somewhat puzzling.  It projects a gain of $16,496 using the "current program", but suggests that the "alternative method" of running the operation, by selling all calves produced at weaning (rather than keeping the bulls calves until breeding age) "would dramatically reduce the annual feed and vet bills by nearly $10,000 on average".  The comparative numbers appear to be $10,500 in the current program for those two items and $3,250 in the alternative program.  In any event, the
(continued...)

Mr. Benefield testified that they only received from Mr. Slaysman one of the profit and loss statements, the "Projected 2006 P&L", which they went over with their accountant. (Mr. Benefield said they got the other statements after the closing.) He also testified that when they discussed the numbers on the 2006 statement with Mr. Slaysman, Mr. Slaysman chuckled and in effect stated that for tax reasons not all the income was disclosed, and that Debtors relied on that oral statement (and perhaps the chuckle as well) for assurance that the operation would be sufficiently profitable. Whether or not Mr. Slaysman actually made that statement, the Court finds that Debtors were sufficiently on notice of the problematic profitability of the operation to have required them to more fully investigate this issue prior to the closing since, after all, their plan to make a living from this operation would obviously have to be bottomed on how much profit they could make. Thus if Debtors had not obtained all the profit and loss statements before closing, they should not have closed (or, for that matter, signed the contract) until they had the statements and had fully investigated the finances of the operation. This was not the fault of Creditors.

---

[35](...continued)
earlier sale of all calves that leads to reduced expenses also leads to far less income ($29,200 vs. $20,200), so that the alternative program results in a less profitable operation.

The dispute about when profit and loss statements were delivered is merely one of many instances that raises the question generally about credibility of both sides and whom the Court finds more credible. To be clear, the Court finds that at no time have Debtors ever deliberately or intentionally misrepresented anything to the Court, and that Debtors genuinely believe what they are saying. The Court is convinced that some of Debtors' statements are incorrect simply because Debtors are innocently or perhaps negligently mistaken. Debtors feel very intensely about all that has gone on (not inappropriately, given the stakes), and further have a sense that they are just not getting anyone to listen to them, factors which combine to metaphorically produce increasing amounts of heat to the detriment of the light which would be more useful. Particularly is this true of Mr. Benefield.

One example is Debtors' overall assertion that, in effect, a series of attorneys all malpracticed continually in representing Debtors, with Debtors having little responsibility for the poor outcomes. It may be that there was some malpractice – more specifically, as an example, Debtors stated that one of their state court attorneys failed to timely appeal the state court decision denying their motion to set aside the default foreclosure judgment because he was off skiing at Park City,

testimony that was not rebutted although the likely success of such an appeal would be minimal – but to assert that every one of the more than half dozen attorneys they have dealt with made major mistakes that put them in their dire straits, and some of the attorneys effectively admitted that to them, is simply not credible.

Another example of Debtors' inaccuracy is Mr. Benefield's representations to the state court judge about this Court's ruling dismissing the second chapter 12 filing. In the course of that oral ruling, the Court confirmed that the ruling dismissing the case was not subject to the stay provided by F.R.B.P. 4001(a)(3) because the ruling was not a stay modification. The Court then explained to Mr. Benefield how the rule worked, but stressed that it was not applicable to that proceeding. Benefield exhibit 40, p. 19, l. 21 through p. 22, l. 25, Nevertheless, at the subsequent state court hearing approximately a month later, Mr. Benefield earnestly asserted to the state court judge that this Court had ruled that Creditors were stayed for ten days following the dismissal from taking any action to pursue the foreclosure. Benefield exhibit 39, p. 6, l. 25 through p. 7, l. 20. On both occasions Mr. Benefield was hearing from each court some very bad news, undoubtedly generating an intensely unpleasant emotional reaction, and perhaps that

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 30 of 36

explains his wildly inaccurate statements to the state court judge.  In any event there is no question in this Court's mind that Mr. Benefield genuinely remembered the Court's explanation the way he explained it to the state court judge, completely wrong as that recollection was.  These examples illustrate why Debtors' testimony in many respects is not credible, without the Court in any way suggesting that Debtors are lying.

Ms. Slaysman did not testify.  Mr. Slaysman was far more precise and organized in his presentations than Mr. Benefield (not unlike Ms. Benefield compared with Mr. Benefield), and provided a concise and internally consistent narrative, whether under direct or cross examination.  Additionally the documents all seem consistent with his statements.  Perhaps this was the result of many hours of preparation with his counsel and reviewing the documents, but (without disparaging counsel) the Court does not think so.  There were times when Mr. Slaysman testified that he simply did not know the answer to a question or where something was in a document, responses which seem to the Court to belie an explanation of too much preparation.  For these reasons, the Court finds that Mr. Slaysman's testimony was more credible than Debtors' testimony as a general rule, but of course the Court weighs the evidence – documents and testimony – on each issue.

Generally, Debtors insist that they could have made it all work had Creditors been honest with them and performed Creditors' obligations under the Purchase Agreement timely. The Court is not convinced. But even without deciding for this purpose the accuracy of Debtors' accusations against Creditors, the fact is that Debtors never presented evidence of a business plan, or even a budget, that demonstrated that possibility.[36]

Reviewing the evidence about what led up to the bankruptcy filings, and then how Debtors managed their previous bankruptcy cases in this district[37], the Court is not clearly convinced that Debtors have changed, or that there is any other reason, to believe that Debtors will have the discipline and organization, and for that matter the funds, to confirm a chapter 11 case and then successfully perform under it. For that reason

---

[36] For example, even at the final hearing on their motion to impose a stay, when it was critical to demonstrate that they could confirm and perform under a plan, Debtors provided almost no evidence at all of their actual ability to do so. When asked by her counsel if they could make monthly mortgage payments of $1,800, Ms. Benefield, the debtor more attuned to the financial details, responded that she thought so "without looking at the budget particularly closely at this time." If there was any time to look closely at the budget to confirm an ability to make payments, this hearing was it.

[37] The parties presented considerable evidence about the seven (7) previous bankruptcy filings by Debtors in the District of Arizona prior to Debtors' marriage late in 2004. The Court does not need to take that evidence into account since it goes to Debtors' good faith in general, an issue which the Court has determined it need not decide.

the statute does not permit Debtors, through an imposition by
this Court of a stay, to restrain Creditors from acting to
repossess and dispose of their collateral.

Summarizing § 362(c)(4)(D)(i), and regardless of the literal
wording of the statute, there is clearly a reasonable objective
sought by the statute: a debtor must explain why the debtor was
unsuccessful previously and why the debtor should not be held
responsible for that lack of success, and why the court should
think the debtor will be successful in the current case. Thus
the logic of the statutory scheme is that the debtor must prove
good faith as to each of the circumstances designated by the
statute since, for example, it would not make sense for a debtor
to excuse prior filings but not be able to show she or he will be
successful in the current filing. Nor, reflecting Congress'
impatience with serial filers, should the debtor have the
opportunity to try again (with the benefit of the stay), even if
likely to be successful, if she or he had no good reason for the
dismissal of the previous cases. Debtors have not carried their
burden of persuasion with respect to each or any circumstance, so
they must lose their motion to impose the stay as to all
creditors in their current case.

D.      **CREDITORS COMMENCED A STAY RELIEF ACTION IN ONE OF THE
        PREVIOUS CASES WHICH HAD BEEN RESOLVED BY CONDITIONING
        THE STAY**

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 33 of 36

In addition to the protection any creditor is afforded by
§ 362(c)(4)(D)(i), § 362(c)(4)(D)(ii) provides individualized
protection for creditors who in a prior case had obtained some
measure of stay relief. In the first of the New Mexico cases
filed by Debtors, no. 12-08-14483, Creditors filed a motion for
stay relief. Doc 16. The Stipulated Order Resolving Slaysmans'
Motion for Relief from Automatic Stay and Providing Adequate
Protection for Slaysmans' Interest in Property (doc 45) disposed
of the motion. That order provided among other things that
Debtors would make monthly payments to Creditors. Id., at 3. It
required Debtors to do a number of other things as well,
including providing proof of insurance on the improvements, pay
the real estate taxes, etc. Id., at 3-5. And the Stipulated
Order had a "drop dead" provision; that is, the agreement by
Debtors that if they did not cure any payment (or other) default
within a given amount of time following notice of the default,
Creditors could file an affidavit to that effect and the stay
would be modified without a further hearing. Id., at 4.

Given the wording of the statute, it would appear that
any order arising from a motion for stay relief that did not
simply deny the motion outright would provide a basis for finding
a lack of good faith on the part of a refiling debtor. In this
instance, the stipulated order as described obviously

Case 10-11077-s7   Doc 73   Filed 09/14/10   Entered 09/14/10 14:02:34 Page 34 of 36

"conditioned" the stay.  In consequence, Debtors need to have rebutted the presumption of bad faith by clear and convincing evidence.  This they did not do.

**Conclusion**

As to all creditors, since Debtors have not met the objective futility test, there is no need to examine the motion from a general good faith perspective, as in cases such as <u>Gier</u> and <u>Galanis</u>.  And in any event, as to Creditors specifically, Debtors cannot escape the collateral consequences of the stay relief accorded Creditors in the first case.  Therefore the Court will enter an order denying Debtors' Emergency Motion to Declare the Automatic Stay in Effect or in the Alternative to Reinstate Automatic Stay Pursuant to Section 362(c)(4) (doc 8).

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  September 14, 2010

Case 10-11077-s7    Doc 73    Filed 09/14/10    Entered 09/14/10 14:02:34 Page 35 of 36

Copies to:

Cynthia Sue Benefield
David Dwayne Benefield
HC 32 Box 216
Quemado, NM 87829

Jennie D Behles
PO Box 7070
Albuquerque, NM 87194-7070

Danny M. Slaysman
PO Box 1641
Eager, AZ 85925

Christopher M. Gatton
Law Office of George Dave Giddens, PC
10400 Academy Rd., #350
Albuquerque, NM 87111